**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **J. LEONARD SPODEK and** | ) | |
| **ROSALIND SPODEK,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:07-CV-1888-BF** |
| | ) | |
| **THE UNITED STATES** | ) | |
| **POSTAL SERVICE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

This case was tried to the Court on July 11-13, 2011.  Witnesses were sworn; testimony was taken; and exhibits were introduced into evidence.  The Court also considered testimony submitted by deposition and by deposition excerpts.  Before the trial, the parties stipulated to the following facts:

**<u>Statement of Stipulated Facts</u>**

On or about July 23, 1970, the defendant, then the Post Office Department,[1] and the Penner-Ring Company, Plaintiffs' predecessor in interest, entered into a lease ("the lease") for the use of a building at 2810 Wesley Street, Greenville, Texas ("the Greenville Post Office"), which would be used by the defendant as a post office for that community and for other purposes.

1.  Prior to entry into the lease, based on a bidding process with the predecessor in interest, the building was built according to plans and specifications required by and approved by the United

---

[1]  Pursuant to the Postal Reorganization Act, Pub. L. No. 91-375, 84 Stat. 719 (1970), all the functions, powers, and duties of the Post Office Department were transferred to the United States Postal Service, and the Post Office Department was abolished.

States Postal Service ("Postal Service" or the "USPS"), including the use of asbestos-containing materials.

2.   The lease provided for a 20-year base term, beginning on July 1, 1970, and ending on June 30, 1990, with an annual rent of $74,025 for each of the 20 years.

3.   The lease contained six five-year options, to be exercised by the Postal Service.  The lease provided for annual rent of $78,000 for the first and second option periods, $82,000 for the third and fourth option periods, and $86,000 for the fifth and sixth option periods.

4.   The Postal Service exercised the first four of the six five-year options, thus continuing their tenancy of the building through June 30, 2010.

5.   Paragraph 7 of the lease stated, in part, that "The lessor shall, unless herein specified to the contrary, maintain the demised premises, including the building and any and all equipment, fixtures, and appurtenances, whether severable or non-severable, furnished by the lessor under this lease in good repair and tenantable condition, except in case of damage arising from the act or the negligence of the Government's agents or employees."

6.   Paragraph 9 of the lease required the USPS upon termination to "restore the premises to as good condition as that existing at the time of entering upon the same under the lease, reasonable and ordinary wear and tear and damages by the elements or by circumstances over which the Government has no control, excepted."

7.   On or about April 24, 1992, J.  Leonard Spodek and Rosalind Spodek ("Plaintiffs") acquired the Greenville Post Office.

8.   An inspection of the Greenville Post Office in June 1995 confirmed that some of the building materials used in constructing the building were asbestos-containing materials ("ACM").

2

Specifically, the inspection confirmed the presence of asbestos in suspended acoustic ceiling tile, floor tile and mastic, baseboard mastic, pressboard flooring, and transite window panels. At this time, no airborne asbestos structures were detected, and no asbestos structures were detected in dust samples taken at the site.

9. In 1996, the Postal Service placed the Greenville Post Office into an Operations and Maintenance ("O&M") Program in order to monitor the asbestos and control the exposure of employees and customers to it. As a result of the O&M Program, the Greenville Post Office was the subject of periodic monitoring.

10. In the mid-1990's, the USPS attempted to require Plaintiffs to abate the ceiling tiles at the premises, and assured postal workers at the premises that there would be an abatement. After Plaintiffs refused, the USPS, having promised abatement to its workers and their Union, budgeted $248,000 for that abatement. However, the USPS cancelled the project, having determined that the ceiling tile abatement was unnecessary and that no one working in the premises was in any danger from the asbestos-containing ceiling tiles.

11. On November 27, 1999, Industrial Hygiene and Safety Technology, a company from Carrollton, Texas, took four wipe samples from the light fixtures in the building. One of these samples came back positive for asbestos structures of the Chrysotile fiber type. Industrial Hygiene and Safety Technology noted at that time that "it appears unlikely that asbestos contamination on the light fixtures presents a problem to building occupants."

12. In 2000, the United States Public Health Service ("USPHS") performed an asbestos and lead inspection at the Greenville Post Office. It identified several asbestos-containing building materials, although it did not test the plaster covering the cinder block walls. The USPHS identified

3

the asbestos fiber type contained in the ceiling tiles as amosite asbestos, and the remaining asbestos

materials as containing Chrysotile asbestos.

13.  On March 16, 2006, ERI Consulting, Inc., performed a "limited asbestos inspection and

collected bulk samples of the dust" from the Greenville Post Office.  This sampling was done at the

request of Alan P. Meyers, then the Acting Manager for District Safety at the Postal Service's Dallas

District.

14.  ERI collected nine samples from some building materials – although not from the sealing

plaster applied to the cinder block walls – as well as three dust samples.  The nine material samples

proved negative for asbestos, but one of the dust samples (0316-03) was confirmed to contain 41

asbestos structures in a sample that had a dust concentration of 40,533.4 parts per square centimeter.

15.  The ERI report, dated May 15, 2006, offered the following advice:

> Although only one of the samples confirmed the presence of asbestos fibers,
> it is not possible to rule out the potential presence of additional asbestos
> fibers in any settled dust.  Therefore, all the dust should be considered to be
> asbestos-containing, and we recommend that the dust be cleaned up and
> disposed of in the regulated manner by a licensed asbestos abatement
> contractor, under the direction of a licensed asbestos consultant.

16.  On June 14, 2006, Halff Associates, Inc. ("Halff"), an architectural, engineering, and

environmental services company based in Richardson, Texas, performed asbestos air sampling at

the Greenville Post Office.

17.  Halff collected three air samples, but "none of the three air samples contained detectable

asbestos structures."

18.  On or about August 14, 2006, Larry D. Brooks, Manager, Real Estate, Southwest

Facilities Service Office, Postal Service, sent a letter to  Plaintiffs, advising them that tests

performed in 2006 at the Greenville Post Office had detected the presence of asbestos there.  Mr. Brooks directed Plaintiffs to remove the ceiling tiles and repair roof leaks, which were suspected of damaging asbestos-containing ceiling tiles.

19.  In the fall of 2006, Halff performed additional asbestos testing at the Greenville Post Office.  On September 25, 2006, Halff conducted "limited asbestos wipe sampling" at the Greenville Post Office, which consisted of "twelve wipe samples to collect accumulated dust from the light fixtures located above the work room floor."

20.  Halff returned to the post office on October 12 and October 13, 2006, to take 28 more wipe samples of accumulated dust, 12 air samples, and 16 bulk samples of building materials.  Halff did not test the plaster-like material that covered the cinder block walls.

21.  All twelve samples taken on September 25, 2006, "contained detectable concentrations of asbestos structures," ranging from 70,474 asbestos structures per square centimeter to 328,879 asbestos structures per square centimeter.

22.  Of the 28 wipe samples that were taken in October 2006, four contained detectable concentrations of asbestos structures, ranging from 6,852 structures per square centimeter to 10,767 structures per square centimeter.

23.  As of October 21, 2006, the Postal Service was renting other space.

24.  Laboratory analysis of the 12 air samples taken in October 2006 indicated that none of the samples contained detectable asbestos structures.  Laboratory analysis further revealed that no asbestos was detected in 11 of the bulk samples, but five bulk samples, collected from the thermal system insulation, were identified as containing less than 1% of Chrysotile asbestos.

25.  At no time between 1995 and 2006 did testing at the Greenville Post Office reveal the presence of airborne asbestos structures at levels above the limits recommended by OSHA.

26.  In November 2006, the Postal Service retained Tracy K. Bramlett, CIH, CSP, President of Industrial Hygiene and Safety Technology, Inc., to evaluate the potential for an asbestos-fiber release at the Greenville Post Office.

27.  Mr. Bramlett noted that no asbestos structures had been detected in the air and that there was no current airborne hazard to Postal Service employees; he also observed that "[Postal Service] management could no longer guarantee that in the future the results would be the same."

28.  Mr. Bramlett further noted that most of the asbestos detected in the surface samples contained only Chrysotile asbestos fibers, which were also found in certain building materials in the post office.  The type of asbestos fiber found in the ceiling tiles was amosite asbestos.

29.  Mr. Bramlett advised the Postal Service that he felt there had been an asbestos-fiber release within the building between November 27, 1999 and September 25, 2006, but he was "unable to make a determination on where the asbestos on horizontal surfaces comes from in the Greenville Post Office" and characterized the source for such asbestos structures as "unknown."

30.  Mr. Bramlett concluded his report with three recommendations: (1) the ceiling tiles containing asbestos should be removed; (2) the entire building should be "wet wiped" and vacuumed with high-efficiency particulate air ("HEPA") filters; and (3) the air within the building should be cleaned with air scrubbers using HEPA filters.

31.  In October 2006, the Postal Service relocated all of its operations from the Greenville Post Office to other sites within Greenville, Texas.  Plaintiffs offered to lease the Postal Service the retail space of the MPO, which had no asbestos issues, but [the offer] was rejected.

32.  As of October 2006, the Postal Service operations that took place at the Greenville Post Office consisted of two separate activities: (1) retail postal services to the public in Greenville, Texas, and (2) hub operations, namely, the sorting and processing of mail for further delivery to 74 other post offices in north Texas and receiving mail from those same post offices for delivery elsewhere.

33.  In December 2006, contracting officer Sandra A. Rybicki advised Plaintiffs that the Postal Service had relocated all operations from the Greenville Post Office in October 2006.  The contracting officer also directed Plaintiffs to perform remediation at the Greenville Post Office.  The contracting officer further advised Plaintiffs that, because of the relocation, the Postal Service was suspending rent effective January 1, 2007.  This letter stated that if Plaintiffs did not perform the "specified repairs" (which were "cleaning of the facility following OSHA and Texas Department of Health rules and regulations"), the Postal Service will either "make the specified repairs and withhold the costs from future rents" or terminate the lease.  Plaintiffs responded to this letter on January 9, 2007, and requested clarification concerning some of the test results, about why Mr. Brooks requested ceiling tile removal.

34.  Subsequent correspondence from Ms. Rybicki to Plaintiffs, dated April 2, 2007, and May 26, 2007, further advised Plaintiffs that the Postal Service considered that Plaintiffs were obligated to remediate the asbestos condition at the Greenville Post Office.  Plaintiffs continued to request that the Postal Service provide them with a precise scope of work as to what needed to be done at the Greenville Post Office, writing again to that effect on May 17, 2007.

35.  On June 21, 2007, the contracting officer, Ms. Rybicki, terminated the lease, effective June 30, 2007, alleging that the leased space was unfit for occupancy, insofar as Plaintiffs allegedly

had failed to maintain the premises in good repair and tenantable condition, as required by paragraph 7 of the lease.  Once more, Plaintiffs requested, on June 22, 2007, and again on July 2, 2007, a scope of work as to what needed to be done at the building for the Postal Service to again occupy the premises until the end of the lease term.

36.   The Postal Service refused Plaintiffs' offer to continue to use the retail area of the premises, since there was no asbestos detected there, either in the air or on horizontal surfaces.

37.   The Postal Service relocated the postal operations that formerly took place at the Greenville Post Office to several other sites within Greenville, Texas.  The retail operations were relocated to three temporary trailers that were placed on Postal Service property next to a Postal Service building in Greenville called the Carrier Annex, and the hub operations were relocated to a newly rented warehouse in Greenville.

38.   On or about January 24, 2008, the contracting officer issued a demand letter to Plaintiffs in which she claimed that the Postal Service had incurred at least $879,432.65 in damages as a result of the breach of the lease by Plaintiffs.

39.   Plaintiffs demanded in a timely manner that the Postal Service restore the premises as Plaintiffs allege is required by Paragraph 9 of the lease.  The Postal Service did not restore the premises.  No part of the costs of restoration, as claimed by Plaintiffs, has been paid to Plaintiffs by the Postal Service.

40.   Plaintiffs have paid no part of the $879,432.65 to the Postal Service.

41.   Plaintiffs sold the building that formerly housed the Greenville Main Post Office on or about July 11, 2008, for $550,000.

## Findings of Fact and Conclusions of Law

## Governing Law

This case is governed by federal common law. *Forman v. United States*, 767 F.2d 875, 879 (Fed. Cir. 1985). Absent any binding federal precedent that directly addresses a legal issue in the case, the court should "take account of the best in modern decision and discussion." *Padbloc Co. v. United States*, 161 Ct. Cl. 369, 377 (Fed. Cir. 1987). "[W]here the landlord is able but unwilling to repair the premises, he has, by hypothesis, made them uninhabitable and, hence, constructively deprived the tenant of possession." *Robinson v. Diamond Hous. Corp.*, 463 F.2d 853, 869 (D.C. Cir. 1972) (citations omitted). Thus, constructive eviction assures a tenant a premises fit for possession. Default termination is regarded as a forfeiture and is therefore considered a "drastic sanction . . . which should be imposed (or sustained) only for good grounds and on solid evidence." *J.D. Hedin Constr. Co. v. United States,* 187 Ct. Cl. 45, 408 F.2d 424, 431 (1969); *DeVito v. United States,* 188 Ct. Cl. 979, 990 (1969). The Government bears the burden of proving by a preponderance of the evidence that a default termination was justified. *Lisbon Contractors, Inc., v. United States*, 828 F.2d 759, 765 (1987). A nexus between the Government's decision to terminate for default and the contractor's performance is required, and the Government may not use a default as a pretext for terminating a contract for reasons unrelated to contract performance. *McDonnell Douglas Corp. v. United States,* 182 F.3d 1319, 1329 (Fed. Cir. 1999).

A "contracting officer has broad discretion to determine whether to terminate a contract for default and [the reviewing court] will only overturn that decision if it is 'arbitrary, capricious, or constitutes an abuse of discretion.'" *Consol. Indus. v. United States,* 195 F.3d 1341, 1343-44 (Fed. Cir. 1999) (quoting *McDonnell Douglas,* 182 F.3d at 1326); *see also Lisbon Contractors,* 828 F.2d

at 765.   There are four factors "to be used in determining if conduct by a government official is arbitrary and capricious: (1) evidence of subjective bad faith on the part of the government official, (2) whether there is a reasonable, contract-related basis for the official's decision, (3) the amount of discretion given to the official, and (4) whether the official violated an applicable statute or regulation." *McDonnell Douglas*, 182 F.3d at 1326.

One of the questions relevant to a contractor's alleged default is whether the contractor has met contract specifications.   *Lanterman v. United States,* 75 Fed. Cl. 731, 734 (2007) (citing *McDonnell Douglas,* 182 F.3d at 1328).   A clear violation of contract terms by the contractor supports a finding that a reasonable, contract-related basis for the termination exists.   *McDonnell Douglas,* 182 F.3d at 1328.   In this context, the Government has a right to insist on strict compliance with contract specifications, and a contractor's failure to do so may place the contractor in default. *See Lanterman,* 75 Fed. Cl. at 735 (citing *McDonnell Douglas,* 182 F.3d at 1328).   *See also Van Greene*, PSBCA Nos. 5093, 5215, 2007-2 B.C.A. ¶ 33,471 ("[The Postal Service] is entitled to strict performance of its contract requirements.").   Once the Government has met this burden, the contractor must prove that its failure to perform, or delayed performance, was excused.   *Lassiter v. United States,* 60 Fed. Cl. 265, 268 (2004).   This can be done by showing that improper Government action was the primary or controlling cause of the default.   *Abcon Assoc., Inc. v. United States,* 49 Fed. Cl. 678, 687 (citing *TGC Contracting Corp. v. United States,* 736 F.2d 1512 (Fed. Cir. 1984); *Nat'l E. Corp. v. United States,* 201 Ct. Cl. 776, 477 F.2d 1347, 1356 (1973)).

## **Threshold Issue-Building Built to Plans and Specifications**

As a threshold matter, the Court considers Plaintiffs' contention that because Plaintiffs' predecessor in interest constructed the building that formerly housed the Greenville Main Post

Office  in accordance with the plans and specifications provided by the USPS, formerly the Post

Office Department ("Department"), the USPS, rather than Plaintiffs, would have the legal duty to

provide asbestos abatement of the leased property.  The USPS has not contested that the building

was constructed in accordance with Department plans and specifications and accepted by the

Department. Nevertheless, in this case, the only contract in evidence is the written lease executed

by the parties on July 23, 1970.  (Def.'s Ex. 1.)

When the parties know that a written lease is an indispensable step in the procedure creating

the relationship of landlord and tenant, knowledge is imputed to them that the lease, rather than the

plans and specifications for the construction of a building to be thereafter leased,  fixes the rights

and obligations of the parties thereunder.  *United Post Offices Corp. v. United States*, 79 Ct.  Cl.

173, 1934 WL 2029 (March 5, 1934).  Such an undertaking "exact[s] *two* contracts, the first to be

faithfully executed prior to the execution of the second. . . ."  *Id*. (emphasis in original).  The court

further explained:

> The defendant's obligation under the first was to enter into a lease of the building
> after its satisfactory completion.  The first proposal did not fix the terms of the lease
> to be thereafter agreed upon.  The plaintiff . . . may not relieve itself of its assumed
> obligations under a ten-year lease by a contention that the plans and specifications
> for a building to be leased determine the relationship of landlord and tenant under the
> separate lease.

*Id*.  As a matter of law, the duties of the parties in this case are governed by the terms of the lease,

not by the plans and specifications for the building.

## Pertinent Terms of The Lease

The lease provides at Paragraph 7:

> The lessor shall, unless herein specified to the contrary, maintain the demised
> premises, including the building and any and all equipment, fixtures, and
> appurtenances, whether severable or non-severable, furnished by the lessor under this

11

lease in good repair and tenantable condition, except in case of damage arising from the act or the negligence of the Government's agents or employees.   During the continuance of the lease, the interior of the building, including, but not limited to the walls and ceilings, shall be repainted at least once every five (5) years unless required more often because of damage from fire or other casualty, or unless the five (5) year period is specifically extended in writing by the Contracting Officer.   The required painting shall be completed not later than six (6) months following the end of the first and each successive five (5) year period during the continuance of the lease.   For the purpose of maintaining said premises and property, the lessor may at reasonable times enter and inspect the same and make any necessary repairs thereto. Additionally, the lessor shall designate maintenance repairmen for electrical emergencies, for plumbing emergencies, for heating, ventilating and air conditioning emergencies or other emergencies (windows, doors, locks, etc.) to be called in the event of an emergency situation involving maintenance of the leased property and/or equipment when the lessor or his agent cannot be contacted within a reasonable time.

The lease further provides at Paragraph 10(c):

If any building or any part of it on the leased property becomes unfit for use for the purposes leased, the lessor shall put the same in a satisfactory condition, as determined by the Post Office Department, for the purposes leased.  If the lessor does not do so with reasonable diligence, the Post Office Department in its discretion may cancel the lease.

Def.'s Ex. 1.

The leased property was managed by a property management company operated by Andrew Spodek ("Mr. Spodek"), Plaintiffs' son.  According to Mr. Spodek, the management company was required to respond to maintenance calls from the tenant, look into contract questions, do some research, and "sometimes" to visit the facilities.  (Tr., Vol. 1, 17.)  Mr. Spodek testified that if disagreements arose over work that needed to be done at a postal facility, the contract allowed the USPS to hire a contractor, pay the contractor, and then deduct what they paid the contractor from the rent.  (*Id*. 20.)

12

## The USPS's Initial Notice to Plaintiffs and Plaintiffs' Response

On August 14, 2006, the USPS notified Plaintiffs that "due to an employee hazard complaint, the Postal Service contracted with ERI Consultants to perform bulk sampling of residual debris from lights, cabinets, and other horizontal surfaces on the workroom floor." The letter informed Plaintiffs that "the Postal Service followed up by contracting with Halff Associates, Inc., to determine if the employees were exposed to a hazardous condition. Laboratory analysis indicated no exposure at the time of the sampling period." The letter mentioned a problem with water-soaked ceiling tiles containing asbestos falling on lights and equipment. No cleaning activities were permitted on the overhead lights or horizontal surfaces, including the replacement of burned-out bulbs and inoperative light fixtures.[2] (*Id*. 22.) The USPS requested that the asbestos-containing ceiling tiles be removed and that the leaks be repaired. (*Id*.) Plaintiffs were not certain whether they requested a copy of the report. (*Id*. 45.) Plaintiffs' response was that they had fixed the roof and had not heard anything since May of 2006 and that there had been some work done on the ceiling tiles. (*Id*. 24.)

On August 27, 2006, the USPS provided Plaintiffs with asbestos sampling reports and consulting reports. (*Id*.) Mr. Spodek, the property manager, testified that at the time, his awareness of the problems that asbestos could cause was "very little" and "superficial." (Tr., Vol. 1, 43.) Despite his lack of awareness, Mr. Spodek never referred the reports which the USPS sent him to an industrial hygienist or someone of that nature for an opinion. (*Id*. 59.) Further, Mr. Spodek

---

[2] Mr. Alan P. Meyers explained in his deposition that employees complained that by 2006 there was so much dust that the light bulbs could not be changed without disturbing the dust. Thus, it was becoming too dark to work there. (Meyers Dep. at 126-28.)

admitted that he did not have the technical expertise to form his opinion in December 2006 that there was no need to do a clean-up of asbestos. (*Id.* 60.)

On August 29, 2006, Plaintiffs responded to the USPS with an email commenting that "the building was built to USPS specifications, and the use of asbestos-containing materials was common at that time." Plaintiffs concluded that no action was required at that time and notified the USPS that any work done would be at the USPS's expense. (*Id.* 46; Pls.' Ex. 113.)

### The USPS's Request for Remediation Pursuant to OSHA and Texas Department of Health Rules and Regulation and Explanation of Need to Temporarily Relocate During Clean-Up And Plaintiffs' Failure to Provide A Remediation Plan

On December 20, 2006, the USPS further advised Plaintiffs of even higher levels of asbestos structures in the Greenville Main Post Office and provided numerous environmental reports for review. (Def.'s Ex. 20.) The letter directed Plaintiffs to "perfect a cleaning of the facility following OSHA and Texas Department of Health rules and regulations," and notified Plaintiffs that since the presence of asbestos material in the dust required a clean-up that could not be performed while employees were working in the facility, they were relocating to temporary alternate quarters and suspending rent effective January 1, 2007. (*Id.*) The letter referred to the previous August 14, 2006 letter and included a request for a remediation plan from Plaintiffs within 7 days. It notified Plaintiffs that pursuant to the lease, Plaintiffs' failure to respond or to accomplish the needed repairs would result in the USPS's enforcing the contractual rights of the Post Office to make the repairs and withhold the costs from future rents or in termination of the lease as a result of the building being unfit for occupancy. (*Id.*)

14

In January of 2007, Plaintiffs reviewed the reports and "got the gist" of them, but nevertheless responded that they did not understand what the USPS was requesting and devoted half of the letter to questions about whether the USPS intended to continue its occupancy of the building after the lease expired.  (Pls.' Ex. 106.)

On May 26, 2007, in response to a letter from Plaintiffs, the USPS responded that the USPS does not provide a scope of work to landlords but reviews scopes of work provided to it by landlords.[3]  (Def.'s Ex. 22.)  The letter stated that (1) as of April 7, 2007, the USPS had not received a response from Plaintiffs to the December 29, 2006 letter, and (2) accordingly, no firm decision had been made about moving back into the facility, but the USPS was evaluating its options.  (Def.'s Ex. 21.)  Ms. Rybicki, the real estate specialist in charge of the leased property, testified that because postal operations are extensive, the post office cannot just move out for five days and then move back in.   Relocation is expensive and complicated.   Nevertheless, she had no reason to believe that the USPS would not have returned to the leased building if Plaintiffs had remediated it according to an approved plan. (Tr., Vol. 2, 171.)  The USPS sent Plaintiffs another reminder on May 26, 2007.

## The USPS's Notice of Termination of the Lease

As stipulated by the parties, "on June 21, 2007, the contracting officer, Ms. Rybicki, terminated the lease, effective June 30, 2007, alleging that the leased space was unfit for occupancy, insofar as Plaintiffs allegedly had failed to maintain the premises in good repair and tenantable condition, as required by paragraph 7 of the lease."  The letter notified Plaintiffs of their right to appeal the decision.  (Def.'s Ex.  23.)   On January 25, 2008, the USPS sent Plaintiffs a demand

---

[3] Ms. Rybicki was the real estate specialist for the 50 properties Plaintiffs lease to the USPS in five states.  Ms. Rybicki testified that she had extensive experience dealing with Plaintiffs and that she had numerous phone conversations with Mr. Leonard Spodek in addition to the letters.

letter for the additional expenses up to December 31, 2007, caused by Plaintiffs' failure to remediate.  (Def.'s Ex. 25.)  The expenses totaled $879,423.65.  (*Id*.)

## **Actions of the USPS Were Justified**

The Court has considered the *McDonnell Douglas* factors in determining whether the actions of the government officials in this case were arbitrary and capricious. *McDonnell Douglas*, 182 F.3d at 1326.  As stated previously, the factors are (1) evidence of subjective bad faith on the part of the government official, (2) whether there is a reasonable, contract-related basis for the official's decision, (3) the amount of discretion given to the official, and (4) whether the official violated an applicable statute or regulation." *Id.*  The evidence in this case pertains only to the first two factors. There was no claim that too much discretion was given to any official or that any USPS official violated any applicable statute or regulation.  The Court will consider first "whether there is a reasonable, contract-related basis for the official's decision."

Tracy K.  Bramlett, a Certified Industrial Hygienest ("CIH") and Certified Safety Professional ("CSP") reviewed at least 26 reports and performed an onsite visual inspection of the leased premises on November 28, 2006. (Def.'s Ex. 17.)  In Mr. Bramlett's opinion, evacuation of the building by the USPS was reasonable because of the potential for disturbance of the asbestos on horizontal surfaces in the facility.  He also gave the opinion that an asbestos fiber release did occur from November 17, 1999 to September 25, 2006, and that an unknown source either internal or external to the building has caused a fiber release.  (*Id*.)  Mr. Bramlett is a well-qualified asbestos consultant and his testimony is credible.

The USPS proved by a preponderance of the evidence that it was reasonable and necessary for them to temporarily relocate so that remediation could be performed.  Nevertheless, even after the USPS evacuated to temporary quarters, Plaintiffs did not provide a promised remediation plan. Plaintiffs stalled the USPS on their request for remediation, failed to investigate the numerous reports the USPS sent them, and failed to perform their lease obligations after the USPS provided them with evidence that the asbestos in the building was a safety concern for their employees and their customers.  Plaintiffs knew about the earlier problems with the ceiling tiles and the plan to let the dust accumulate.  It should have come as any surprise to Plaintiffs that dust could not be allowed to accumulate forever without danger to the building's occupants.  The USPS sent Plaintiffs all of the reports, and if Plaintiffs were not satisfied with the reports provided by the USPS, they could have had additional studies done at the time.  Although Plaintiffs promised as late as January 24, 2007, that a remediation plan was forthcoming, Ms.  Rybicki, the contract specialist who worked with Plaintiffs never received a remediation plan from Plaintiffs.  The USPS met its burden of proving by a preponderance of the evidence that it was constructively evicted by Plaintiffs' failure to perform their duties under the lease and that the default termination was justified under the circumstances.  *See Lisbon Contractors*, 828 F.2d at 765.

The other factor for the Court's consideration is "whether there is evidence of subjective bad faith on the part of the government officials."  Plaintiffs contend that the default termination of the lease was a pretext for the USPS to leave the leased facility for a better building and make the conclusory allegation that Ms.  Rybicki and others "trumped-up issues at the facility to win approval from headquarters for new facilities."  The Court finds no credible evidence to support Plaintiffs' charge that the USPS "use[d] the Spodeks as pawns in the bureaucratic hijinks which went on here

in the quest for new facilities."  The record contains no credible evidence of subjective bad faith or pretext on the part of the USPS.  The credible evidence demonstrates that the contracting officer believed that the move would be temporary, but had no choice but to terminate the lease because of Plaintiffs' failure to perform the duties required by the lease and their lack of assurances of adequate future performance.  (Tr., Vol. 2, 169-171.)  Plaintiffs were informed of their right to appeal the decision of the contracting officer; however, Plaintiffs failed to appeal.

Plaintiffs suggest that the USPS could have simply evacuated the premises, had the asbestos abated by having the premises cleaned at USPS expense, and then moved back in and charged the cleaning to Plaintiffs.  Early on in the process, Plaintiffs took the position that the abatement of the leased premises was the responsibility of the USPS because the building had been built to USPS specifications.  (Pls.' Ex. 113.)  Plaintiffs had told the USPS that if the USPS incurred the charges, Plaintiffs would not reimburse them.  (*Id*.)   The record contains no indication that Plaintiffs intended to do anything but string the USPS along by promises of a remediation plan.  Plaintiffs were not forthcoming and showed no willingness to remediate the asbestos nor to reimburse the USPS the expenses of abatement.  The USPS operations were not such that moving to a temporary location was either easy or inexpensive.  The actions of the USPS were reasonable.

The USPS met its burden to prove by a preponderance of the evidence that the default termination was justified.  Plaintiffs' failure to perform their duties constituted a constructive eviction and a default under the lease that was not attributable to the USPS.

### **Plaintiffs Burden to Show Their Refusal to Perform Was Excused**

Once the USPS met its burden to show a default by Plaintiffs, the burden shifted to Plaintiffs to show improper action by the USPS was the primary or controlling cause of Plaintiffs' default.

18

Plaintiffs failed to meet this burden.  The record is devoid of competent evidence that the USPS caused Plaintiffs' default or acted with an improper motive.  Further, Plaintiffs' claim that the remedial work could have been accomplished without the USPS's evacuation of the building is not supported by the evidence.  The preponderance of the evidence shows that the nature of postal service is such that there is no down time when no employees are present.  Mr. Bramlett, the expert, testified to the danger from disturbing the dust while employees were present.  Similarly, the evidence did not support Plaintiffs' claims that the USPS caused the release of asbestos from the wall texture in the workroom.

The USPS evacuated the building in July 2006.  Although Plaintiffs' witness tested dust from the bottom of the wall in July of 2007, he testified that the building had not been secured and admitted he did not know when the wall had been damaged.  (Tr., Vol. 2, 84.)  Plaintiffs failed to prove their claim that the negligence of USPS employees caused the asbestos to be released.  There is no credible evidence of USPS negligence.  The source of the released asbestos was never determined.

The fact that the USPS had tolerated the asbestos-containing dust build-up on the light fixtures for a period of time by following a plan that involved not changing burned-out light bulbs did not relieve Plaintiffs of their duty under the lease to maintain the building in tenantable condition.  In the earlier period, before the "toleration of dust-in-place" began, the USPS had requested Plaintiffs to remove the ceiling tiles and Plaintiffs flatly had refused, incorrectly asserting the removal was USPS responsibility because the building had been built to post office plans and specifications.  When the dust buildup increased and the work room became too dark for employees to perform their jobs because they were not allowed to change the light bulbs, the employees, fearing

19

for their safety, voiced their concerns about the dust buildup to USPS management. Management, in accordance with the terms of the lease, requested Plaintiffs remedy the hazardous condition. Despite Plaintiffs' attempts to deny remediation for a second time by claiming they did not understand what was required, USPS management once more attempted to work with Plaintiffs for a long period of time. The USPS's request for a remediation plan from Plaintiffs was not unreasonable given their past experiences when dealing with Plaintiffs on maintenance issues. The default resulted from Plaintiffs' failure to fulfill their duty to remove the hazardous conditions from the leased property and not from anything the USPS did, or failed to do. Plaintiffs did not show by a preponderance of the evidence that any improper action by the USPS was the primary or controlling cause of Plaintiffs' default. *See Abcon Assoc., Inc. v. United States,* 49 Fed. Cl. 678, 687 (citing *TGC Contracting Corp. v. United States,* 736 F.2d 1512 (Fed. Cir. 1984); *Nat'l E. Corp. v. United States,* 201 Ct. Cl. 776, 477 F.2d 1347, 1356 (1973)).

## Plaintiffs' Claims for Damages

Plaintiffs failed to perform the terms of their contract, causing an event of default. Plaintiffs' failure to perform their duties was material and harmful to the USPS. Plaintiffs have failed to show that any action or inaction by the USPS excused Plaintiffs' default. Further, a preponderance of the evidence does not support Plaintiffs' claims for $125,278 for unpaid rent, $14,276 for unpaid taxes, $6,298 for unpaid utilities, $157,166.59 for future rental, $3,025 for repairs during vacancy, $32,250 for project management of restoration, and $3,106,799 for tainted building value. The USPS is not liable to Plaintiffs for unpaid rent, unpaid taxes, unpaid utilities, future rental, repairs needed during

20

vacancy, project management of restoration, or tainted building value.[4]  The evidence does not show that the fair market value of the former Greenville Post Office building was diminished by anything the USPS did, or failed to do.  The building was in constant use for 37 years in post office operations which required heavy equipment to be used.  Although Plaintiffs had a duty under the contract to paint the building every five years, there was no evidence that Plaintiffs fulfilled this duty required by the lease.  Plaintiffs contended the USPS decreased the market value of the building by making public the fact that the building contained asbestos.  However, the record contains no competent evidence that the USPS diminished the fair market value of the building by releasing information about the building's condition, or by any other means.

### Plaintiffs' Claim Against the USPS for Restoration of the Premises

Plaintiffs contend that the USPS damaged the building beyond ordinary wear and tear and that the USPS is liable to it in the amount of  $188,020 for "Restoration of the Premises."  (Pl.'s Ex. 88.)  The USPS maintains that the building was used industrially for 37 years and considering that use, the condition in which they left the building showed only ordinary wear and tear.  The USPS presented as a witness, D'Wayne Bradford, an architect engineer with the Southwest Facility Services Office, who testified to the condition of the building after the USPS moved out.  Mr. Bradford considered Plaintiffs' Exhibit 88 and explained that the exhibit listed many items which were not the responsibility of the USPS such as abatement costs, including abatement of the ceiling tiles, flooring mastic from the first floor work room, and abatement of floor tile and mastic from the basement.  Mr. Bradford did an item-by-item assessment of Plaintiffs' Exhibit 88 and found the

---

[4]  Plaintiffs withdrew their claim for unpaid rent for use of the basement in the amount of $52,756. The Court will consider Plaintiff's claim of $188,020 for restoration of the premises separately.

building needed repairs in the amount of $27,425 to compensate Plaintiffs for damages beyond ordinary wear and tear. The Court finds Mr. Bradford to be the most credible witness with respect to damages beyond ordinary wear and tear. Plaintiffs failed to prove that the USPS caused damages beyond ordinary wear and tear in the amount of $188,020. The Court finds that the USPS is liable to Plaintiffs only in the amount of $27,425 for damages to the leased building beyond ordinary wear and tear. Accordingly, the USPS is not liable for the remaining $160,595 of the $188,020 in damages that Plaintiffs were seeking in restoration costs.

## The USPS Counterclaim for Damages

The USPS brought a counterclaim for temporary relocation costs of $879,432.65 through December 30, 2007. (Def.'s Ex. 24, Pls.' Ex. 112). The USPS's claimed damages are divided into relocation of the retail operations and relocation of hub operations.

## Relocation of the Retail Operations

### Plaintiffs' Claim that the USPS Failed to Mitigate its Damages

Plaintiffs claim that the USPS failed to mitigate its damages with respect to costs for temporary location the retail operations because Plaintiffs offered to let the USPS continue to occupy the retail space. Plaintiffs contend that the USPS could have continued to occupy the retail operations part of the leased building because the retail part contained no asbestos. "To mitigate his contract damages, the non-breaching party is required to make those efforts that are fair and reasonable under the circumstances." *First Heights Bank, FSB v. United States*, 422 F.3d 1311, 1316 (Fed. Cir. 2005) (quoting *Home Sav. of Am., FSB v. United States*, 399 F.3d 1341, 1353 (Fed. Cir. 2005)).

The USPS witness testified that the retail operation could not remain in its present location

because when trucks deliver mail to the facility, the postal operations require a separate entrance other than the one customers were entering.  (Tr., Vol. 2, 66-67.)  The Court finds by a preponderance of the evidence that it would not have been fair and reasonable under the circumstances to require the USPS to mix its customer and trucking operations to enable it to keep its retail operations in the leased building.  The USPS did not fail to mitigate its damages in this respect.

## Costs for Relocation of the Retail Operation

The USPS claims design costs of $50,693 and construction costs of $309,306 for a total of $360,000 for relocation of the retail operation.  Plaintiffs claim that the USPS failed to prove these costs by a preponderance of the evidence.  Mr. Harvey Henry Sanders, the USPS's officer in charge of Greenville, Texas, testified that the retail relocation move was intended to be temporary. (Sanders Dep. at 24.)  Mr. Sanders explained that the USPS brought up three post office trailers from Louisiana.  (*Id*. at 51.)  He said that very little rework was done because the trailers are specifically designed for immediate move-in.  (*Id*.)  He stated that the post office box sections are already there and the post office simply puts the numbers on them and reissues keys.  (*Id*.)  No witness testified to the actual work that was done on the USPS trailers.  The USPS failed to prove by a preponderance of the evidence that the amount of $360,000 for the design and construction of a temporary retail location was reasonable under these circumstances.  Accordingly, the USPS may not recover $360,000 for the design and construction of a temporary retail location.

## Costs for Relocation of the Hub Operation

In the USPS's demand letter to Plaintiffs, the hub operation relocation was divided into design and construction management costs of $11,906.50, together with construction costs of

23

$238,093.75 for a total of $250,000.25; increased rental costs in the amount of $23,349; and air conditioning costs of $246,083.33.  Mr. Bradford testified that the costs for the hub operation's temporary quarters, incurred, and paid, were $248,999.  (Tr.  Vol.  3, 34-35.)  No witness testified to "increased rental costs."   Further with respect to the  $246,083 for air conditioning at the temporary hub facility that the USPS is claiming, no credible evidence supports this amount.  Although Mr. Bradford testified that the temporary hub did not have adequate air conditioning for its intended use, Plaintiffs impeached Mr. Bradford's testimony with his earlier sworn deposition testimony.  At the trial, Mr. Bradford admitted that he had given the following testimony under oath at his deposition:  His first involvement at the Greenville Main Post Office itself was reviewing potential sites for relocating the post office, including the hub for sorting. (Tr., Vol. 1, 195-96.)  His job was to determine what needed to be done to the warehouse facility which would become the temporary sorting facility.  (*Id*.)  Part of his job was to inspect the site and determine whether the temporary hub had adequate heating, ventilation, and air conditioning.  (*Id*.)  Mr. Bradford testified "the temporary hub had adequate heating, ventilation, and air conditioning for its intended use by the USPS as it stood on the ground the day he inspected it."  (*Id*.)  Mr. Bradford's diametrically opposed testimony at trial is not credible, leaving no evidence to support the expenditure of $246,083 for air conditioning at the temporary location.

To summarize, the USPS suffered damages incurred by moving to temporary quarters; however, the USPS failed to submit evidence to support the sum of $879,432.65 which it demanded from Plaintiffs for moving the post office to temporary quarters.  The expenditure of $246,083.32 for air conditioning was not supported by any evidence, given Mr. Bradford's inspection and determination of the adequacy of the existing heating, ventilation, and air conditioning for its

24

intended temporary use by the USPS. The necessity for $360,000 for designing and constructing a temporary retail and box lobby section is unsupported by evidence, given the USPS admission that it had and utilized post-office trailers in move-in condition for a temporary location.  Further, the USPS presented no evidence of "increased rental costs."  However, the Court does find the USPS proved by a preponderance of the evidence that it suffered damages only in the amount of $248,999, the costs of the hub operation's temporary quarters.

**Conclusion**

The USPS proved by a preponderance of the evidence that Plaintiffs constructively evicted it from the leased property and defaulted on the lease, and Plaintiffs are liable to the USPS for relocation costs in the amount of $248,999.  The USPS is liable to Plaintiffs for damage to the leased property in excess of ordinary wear and tear in the amount of  $27,425.  Setting off the USPS's liability to Plaintiffs against Plaintiffs' liability for the USPS's relocation costs of $248,999, the USPS shall have final judgment against Plaintiffs in the amount of $221,574.  Each party shall bear its own costs.

SIGNED, April 18, 2012.

PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE